UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

PATRICIA THOMAS

            PLAINTIFF

   -AGAINST-

DETECTIVE DILLON MCGEE AND
OFFICERS JOHN DOE 1-4
_____

DOCKET NUMBER
DATE FILED: JULY 23, 2025
VERIFIED COMPLAINT

Plaintiff, Patricia Thomas, through her attorney Tamara M. Harris, hereby complains and alleges as follows:

### THE PARTIES

1. Plaintiff Patricia Thomas resided at 197-14 119th Avenue, St. Albans NY 11412 at all relevant times pertaining to the allegations in this complaint.

2. Defendants Detective Dillon McGee and Officers John Doe 1-4 worked out of the 113 precinct located at 167-02 Baisley Boulevard, Jamaica NY 11434.

### JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. Section 1331, as there is a federal question.

4. Venue is proper in this district under 28 USC Section 1391(b).

### FIRST CAUSE OF ACTION- UNLAWFUL SEIZURE OF PLAINTIFF BY DETECTIVE DILLON MCGEE AND OFFICERS JOHN DOE 1-4 IN VIOLATION OF PLAINTIFF'S FOURTH AND FOURTEENTH AMENDMENT RIGHTS UNDER 42 USCS SECTION 1983

5. Patricia Thomas was a tenant who resided at the premises known as 197-14 119th Avenue, St. Albans, New York 11412 on July 6, 2022, owned by Herbert George.

6. Eric Chambers, who managed the property for Herbert George, leased the first floor of the property to plaintiff.

7. Eric Chambers had a girlfriend named Jennifer Blake, who had no ownership or management role in the subject property.

8. Nevertheless, she terrorized plaintiff and posed an incessant nuisance to the premises, along with her boyfriend Eric Chambers.

9. Subsequent to leasing the first floor of the subject property to plaintiff, Eric Chambers and his girlfriend Jennifer Blake then broke into plaintiff's apartment and stored all their furniture and belongings in plaintiff's apartment- thereafter refusing to move it out when plaintiff demanded the same.

10. Thereafter, Jennifer Blake caused a fire in the property, resulting the roof being severely burnt and extensive water damage to the property as a result of the destruction caused to the roof.

11. Eric Chamber and Jennifer Blake thereafter threatening to harm plaintiff if she refused to continue to pay the rent- despite the roof being burned off and rain pouring directly into plaintiff's home.

12. On February 4, 2022 the situation went from bad to worse, when a major snow storm struck.

13. Plaintiff called Eric Chambers, since he managed the property for the true owner Herbert George, to take steps to remove the snow- which he and Herbert George ignored.

14. On February 4, 2022 plaintiff suffered a major injury on the premises after slipping on ice, as a result of the negligence of Eric Chambers and the owner of the property- in ignoring plaintiff's texts about salting the area and giving her access to the basement so that she could get the necessary materials and do it herself if they weren't going to do anything.

15. As plaintiff was entering her home she slipped on the ice and hit her head on concrete, along with her back.

16. As a result she sustained head swelling and a severe spinal injury.

17. A neighbor called 911, and the ambulance took plaintiff to the hospital.

18. Plaintiff remained hospitalized for 6 weeks and then had to undergo intensive rehab because she broke her sacrum- located at the base of the spine and top of the pelvic cavity, between the hip bones.

19. Plaintiff filed a lawsuit in Queens Supreme Court against the owner of the home, Herbert George, for his negligence (and his manager Eric Chambers negligence) in refusing to take any steps to clear or salt the snow- resulting in plaintiff sustaining a crippling injury.

20. The evidence to support the lawsuit included a video of the incident, that was captured on plaintiff's home camera system, with the main system located in plaintiff's first floor apartment.

21. Eric Chambers and his girlfriend began threatening plaintiff that the owner wanted the video footage destroyed and threatening to harm her, even attempting to break into the home with the spare key Eric had as manager of the property, while a relative was in the premises- resulting in the relative called 911 and Chambers and his girlfriend being ordered to leave by the police.

22. Subsequent to plaintiff's protracted hospitalization and rehab, she returned home for in-house physical therapy (since she was not mobile enough to travel to the physical therapy facility and could barely walk with the assistance of a walker).

23. Even the shower, had special equipment including a medical chair, and bars to enable plaintiff to get from the shower to her walker after cleaning herself.

24. On July 23, 2022 plaintiff has her little grandchild visiting and had just got out of the shower, and had managed to get to her walker.

25. She wasn't even fully clothed when Eric Chambers and Jennifer Blake broke into the home again to steal all the video equipment and devices that had the footage of plaintiff's fall (needed for court).

26. After breaking into the home to rip out and steal all the video equipment, plaintiff heard banging downstairs and saw Eric Chambers and Jennifer Blake in her home.

27. Plaintiff tried to get her phone to record, but Eric Chambers punched plaintiff and Jennifer Blake went for plaintiff's neck- pushing her backward and out of her slippers and to the ground.

28. When it was over plaintiff managed to call 911 while her grandbaby was hysterical.

29. After calling 911 plaintiff heard the police outside her door say "where is she".

30. Jennifer Blake and Eric Chambers were directing the police to arrest plaintiff, who they indicated was inside the residence.

31. When police arrived, plaintiff was not even fully dressed and could barely walk even with the aid of her walker.

32. Plaintiff was partially unclothed and sitting on her walker inside her house after the attack.

33. Police entered her home without even investigating anything, and began taking steps to place her under arrest.

34. The police had no warrant to enter the home.

35. Plaintiff advised the police she was the 911 caller who called after being attacked in her own home, as set forth above.

36. At the time the police entered the home via there warrantless entry, it was clear plaintiff was physically disabled and unable to walk at all without the assistance of a walker due to a fractured spine; and that she had called 911 as the victim of both an assault and burglary that took place inside her own home.

37. The police refused to even entertain plaintiff's story about being attacked, and after engaging in a warrantless entry into the home, proceeded to arrest plaintiff without advising her of her rights.

38. Detective Dillon McGee arrested plaintiff for allegedly "throwing" her landlord Jennifer Blake down a flight of stairs on July 6, 2022- eighteen days earlier and when plaintiff was in an even more debilitating state than the day she called 911.

39. No reasonable officer or detective would find such an absurd story about the disabled and elderly plaintiff throwing her (fake) landlord down a flight of stairs plausible under the circumstances, including the absence of any injury to Jennifer Blake, public records confirming Blake was not plaintiff's landlord, and the absence of any stairs upon which plaintiff could throw Blake from the first floor apartment.

40. This story, apparently made up by the Blake and her boyfriend in response to the 911 call plaintiff made, was not plausible to any objectively reasonable law enforcement member.

41. First, Blake was not the owner of the property or registered manager of the property, and there was a deed filed on acris identifying the true owner of the property accessible to the public, which defendants could definitely access- by conducting the most minimal investigation- to confirm the identity of the true owner (not Blake).

42. The true owner of the property could be identified in a one second acris search on the internet, and the owner and manager of the property could also be identified by a simple search on HPD's website to confirm Jennifer Blake did not own the subject premises or manage the same.

43. Blake was a mere trespasser with no ownership or management title; and her presence in plaintiff's home to beat plaintiff and steal video footage was a trespass, burglary and assault.

44. In the most inept investigation, Detective McGee arrested plaintiff based on allegations she was Blake's "tenant" and that plaintiff "pushed" Blake "down a flight of stairs" at the property.

45. The allegation defied common sense and no reasonable law enforcement official would find that allegation credible based on plaintiff's inability to even walk as a result of a broken sacrum (much less throw someone down a flight of stairs); the fact that plaintiff lived on the first floor and there were no stairs to throw anyone down; the fact that plaintiff was the 911 caller who called for help; and the openly accessible public records from HPD and Acris confirming Jennifer Blake had not legal right to be in plaintiff's home because she was not the owner, or the registered management agent.

46. Even the bare minimum investigation by a minimally competent officer or detective would have uncovered that Blake was neither an owner or registered manager of the property, as those public records are accessible through the websites for ACRIS and HPD to the public, and are certainly more accessible to NYPD personnel.

47. This was not a guessing game in terms of whether Blake was trespassing on plaintiff's property, or whether she had a right to break into plaintiff's home and beat her.

48. Detective McGee and Officers John Doe entered plaintiff's home without a warrant and arrested plaintiff in a semi-naked state (since she had been beaten upon exiting the shower and was resting on her walker after calling 911)- based on allegations that any detective or officer would know to be completely contrived (after this physically disabled senior citizen was sitting on her walker after being attacked in her own home by a woman impersonating her landlord in reacting to a 911 call plaintiff lodged).

49. All defendants entered plaintiff's home without a warrant in order to carry out an arrest that was devoid of probably cause.

50. Handcuffing the half-naked, and disabled plaintiff in her own home as a response to plaintiff calling 911 was objectively unreasonable and unconscionable.

51. Notably, Jennifer Blake had no injuries as a result of being "thrown" down a flight of stairs by "her tenant"; and there was no flight of stairs upon which the plaintiff (reliant on a walker to hold herself up) could throw Blake down with respect to plaintiff's first floor unit-making the arrest further unreasonable under an objective standard.

52. Plaintiff repeatedly asked all John Does and Detective McGee to go to the hospital, which pleas were ignored.

53. Male officers put some clothes on plaintiff to facilitate the arrest and handcuffing, since she only had a bra and short tights on.

54. Defendant put handcuffs on plaintiff while engaged in a warrantless entry in her home, didn't read her rights and began to transport her to the 113 precinct as plaintiff's 2 year old grandchild was left hysterically crying by this insane spectacle.

55. No reasonable officer or detective in defendants' shoes, looking at plaintiff's physical appearance and disability and based on publicly available record on Acris and HPD's website would believe she had thrown her fake landlord Jennifer Blake down a flight of stairs from plaintiff's first floor residence (which had not stairs); or arrest her for the same.

56. Without a warrant, police entered plaintiff's home to arrest her; and then without any probable cause to do so, placed plaintiff under arrest.

57. Thereafter, plaintiff was detained in a cell for the entire night, and not arraigned until the following day (despite being in dire medical condition to be discussed in greater detail in the section relating to the second cause of action).

58. All defendants were members of the New York City Police Department when they effectuated the seizure of plaintiff on July 23, 2022.

59. All defendants were state actors acting under the color of state law, and their actions were violative of plaintiff's Fourth and Fourteenth amendment rights against unreasonable seizures and restraints on libersty.

60. The conduct of all defendants violated a clearly established statutory right,; to wit, 42 USC Section 1983; and clearly established constitutional rights; to wit, the Fourth and Fourteenth Amendments to the United States Constitution

61. Defendants transported plaintiff to the 113th precinct based on an unlawful arrest that was objectively unreasonable, stemmed from a warrantless entry into plaintiff's home; and for which any reasonable officer or detective would know was lacking in probable cause.

62. Defendant's conduct in arresting a disabled plaintiff, who couldn't even walk properly without a walker, and who called 911 for a break-in, was malicious and caused plaintiff severe emotional and physical stress,anguish and injury.

63. Ultimately, all charges against the plaintiff were dismissed.

64. Wherefore, plaintiff seeks $5 million in punitive damages; $5 million in emotional damages and $50,000 in compensatory damages for legal fees, court costs and related expenses.

## SECOND CAUSE OF ACTION- DETECTIVE DILLON MCGEE AND OFFICERS JOHN DOE 1-4 SHOWED DELIBERATE INDIFFERENCE TO HER MEDICAL NEEDS UNDER THE 14TH AMENDMENT DUE PROCESS CLAUSE AND 42 USC SECTION 1984

65. Plaintiff was transported to the 1113 precinct, and placed in a cell for the entire night.

66. Plaintiff is a diabetic, who told the officers she needed medication for her diabetes.

67. Plaintiff became increasingly sick upon being detained and countlessly begged Detective Dillon McGee and Officers John Doe 1-4 to take her to a hospital.

68. Detective Dillon McGee and Officers John Doe 1-4 refused to call an ambulance.

69. While in custody, plaintiff similarly begged to be taken to the bathroom, which request was similarly denied.

70. Plaintiff was told she needed to wait to go to Central Booking.

71. While in the cell, and as her pleas for medical care fell on deaf ears, plaintiff's blood sugar went up to 500, despite a normal blood sugar being between 70 to100.

72. A blood sugar level of 500 is considered an extremely dangerous and life threatening situation for which emergency medical care is crucial, yet defendant detective and John Does refused to listen to plaintiff's pleas for help as she urinated herself, cried

out that she was extremely dizzy and about to faint, with blurred vision and related symptoms.

73. Even when plaintiff lay on the floor of her cell crying for help in her own urine, and unable to hold her body up because her blood sugar was off the charts high, she was ignored by Detective Dillon McGee and John Does 1-4 for hours upon hours.

74. Even when plaintiff's nausea became so unbearable that she began to vomit in her cell, her pleas for an ambulance and hospital were ignored by Detective Dillon McGee and John Does 1-4.

75. It was not until a female in the precinct, who appeared to have some medical training, saw plaintiff's medical condition (after hours upon hours of plaintiff crying for help) that she demanded plaintiff be transported to the ER.

76. By the time plaintiff was finally taken to the ER (as a result of the female at the precinct who witnessed her condition after hours upon hours of being ignored by all defendants including Detective McGee), plaintiff's blood sugar was at life threatening levels, had surpassed 500, and had to be brought down with IV medication.

77. Plaintiff was brought to the hospital in shackles even though she was in horrendous condition and posed no threat to anyone.

78. Plaintiff's condition was so horrendous as a result of defendants' neglect for so many hours that she had to receive intravenous medication to bring her blood sugar down from critically dangerous levels.

79. In fact, at one point the nurse directed the officer to remove the shackles so that plaintiff could be taken to the bathroom by other staff to urinate, be cleaned up (since she had been left in her cell to urinate on herself), and to receive other treatment without the impediment of shackles- to which Officer John Doe refused; and plaintiff was forced to continue to sit in her own urine.

80. John Doe ultimately transported plaintiff to central booking after he felt she appeared stable enough to be transported to central booking, pressuring the hospital staff to discharge plaintiff.

81. But, plaintiff had been neglected so long by defendants in her cell at the 113 precinct, that her condition was not able to be stabilized sufficiently, and her transport to Central Booking was improperly expedited when John Doe pushed hospital staff to discharge her quickly so that he could have her brought to arraignment.

82. As a result of John Doe pushing for an expedited discharge, plaintiff's condition rapidly deteriorated again upon arrival in central booking.

83. A nurse in central booking refused to hold plaintiff for arraignment and demanded John Doe take plaintiff back to the hospital based on plaintiff's atrocious medical condition.

84. Plaintiff at this point was drenched in her own urine, sweating, dizzy, and on the brink of losing consciousness again, and her blood sugar was abnormal.

85. After a second hospitalization, that would not ever have needed to occur if all defendants provided plaintiff with prompt medical care upon request (hours earlier), plaintiff was finally stabilized enough to be arraigned.

86. Defendant Detective McGee and John Does' deliberate indifference to plaintiff's medical needs for hours (including hours spent on the floor of her cell pleading for medical care) caused her to endure extreme pain, discomfort and illness to the point she was on the verge of lapsing into a diabetic coma- which can be triggered when blood sugar reaches 600.

87. Plaintiff's blood sugar, by the time she was finally taken to the hospital (after hours of pleas were ignored) had already reached 500.

88. During the time plaintiff was being held in custody by all defendants she was a pre-trial detainee entitled to medical care when she vocalized she was diabetic and that her symptoms were progressively getting worse, ranging from dizziness, profuse sweating, vomiting, self-urination, pain and all symptoms of escalating blood sugar.

89. Plaintiff, as a pre-trial detainee, had a substantive due process right under the 14th Amendment to adequate and timely medical care.

90. It was a violation of the plaintiff's 14th amendment due process right for Detective McGee and John Does 1-4 to ignore plaintiff's pleas for an ambulance and hospitalization to treat her diabetes- for hours upon hours- up until the point plaintiff's blood sugar became so dangerously high that she was vomiting, dizzy, on the floor of her cell, on the brink of unconsciousness, laying in her own urine, and

with a blood sugar that was slowly escalating to levels so dangerous that she was on the brink of a diabetic coma.

91. Instead of doing what any objectively reasonable officer or detective would have done (call for an ambulance and get plaintiff medical care for her diabetes), these defendants literally ignored plaintiff's cries for help; ignored her pleas for an ambulance; ignored her cries about needing medication for her diabetes; let her lay on the floor of the cell in her own urine writhing in pain and anguish from being too dizzy to hold herself of; and continued to let plaintiff's condition deteriorate for hours before a female employee of the NYPD arranged to have an ambulance called upon seeing this horrific scene of medical neglect by defendants.

92. Defendants failed to fulfill their Fourth and Fourteenth Amendment obligations in this case, in that they failed to promptly call an ambulance or provide plaintiff with medical care by taking her to a hospital until her sickness escalated to a point that she was on the verge of a diabetic coma, and a third party at the precinct (not any of the defendants) intervened in time to save plaintiff's life by demanding plaintiff be taken to a hospital.

93. Had it not been for that unknown female, plaintiff's condition in that cell could have potentially turned fatal, since defendants refused to summon any medical care for plaintiff at all, for hours.

94. Plaintiff's condition would have put a reasonable officer or detective on notice to summon for medical care.

95. Defendants actions in refusing to do so for hours (and until someone else intervened) was not objectively reasonable.

96. The length of the delay caused by all defendants' neglect in summoning an ambulance or transporting plaintiff to a hospital, despite being placed on notice she was diabetic and the severity of her condition, was egregious and objectively unreasonable.

97. Plaintiff suffered a constitutional denial of medical care under the 14th amendment due process clause because she had a serious medical need, in that she was diabetic and experiencing escalating symptoms for hours to the point those symptoms became life threatening.

98. Even a layman seeing plaintiff vomiting, complaining of dizziness, laying on the foor on the verge of unconsciousness soaked in her own urine; and hearing plaintiff's pleas for hours that she needed a hospital because she was diabetic- would easily recognize the necessity for a doctor's attention.

99. Plaintiff had a serious medical condition (symptomatic diabetes) in need of contemporaneous treatment or care, and her need was met with deliberate indifference by all defendants- even though her condition was so severe that, if left unaddressed, it was capable of causing death, degeneration or extreme or chronic pain.

100. In fact, because of all defendant's inaction for hours, plaintiff did endure severe pain, nausea, dizziness, vomiting, inability to hold her bladder (resulting in

her urinating on herself) and escalating blood sugar levels verging on levels that would cause diabetic coma.

101. Defendants McGee and John Does 1-4 engaged in a deliberately indifferent response to that need as well as a sufficiently culpable state of mind, in that 1. they made an intention decision with respect to the conditions under which the plaintiff was confined (taking absolutely no action to get her medical care when ignoring her pleas, cries about needing medication for diabetes, and deteriorating condition), 2. those conditions put the plaintiff at substantial risk of suffering serious harm (the delay caused by defendant's inaction for hours resulted in plaintiff's blood sugar skyrocketing to critical levels as a proximate result of such inaction); 3. the defendants did not take reasonable available measures to abate that risk, even though a reasonable officer or detective in those circumstances would have appreciated the high degree of risk involved- making the consequences of defendant's conduct obvious, 4. and by not taking such measures, the defendant caused plaintiff's injuries (her blood sugar to eventually skyrocket so high she was dangerously symptomatic,at the threshold for a diabetic coma, and would have potentially died if a third party did not intervene).

102. All defendants acted intentionally to impose a condition of confinement while ignoring pleas for medical care for hours (while leaving plaintiff lying in urine in her cell writhing in pain and agony at the 113 precinct).

103. Alternatively, defendants at least acted recklessly in failing to act with reasonable care to mitigate the risk the condition posed to plaintiff, a pre-trial

detainee, even though all defendants knew, or should have known, that the condition posed an excessive risk to health or safety.

104. All of the above defendant's conduct was malicious and caused plaintiff to suffer severe physical and emotional trauma, stress, anxiety and anguish

105. Wherefore, on plaintiff's reckless indifference claim plaintiff seeks $15 million punitive damages; $15 million in emotional damages; and over $50,000 compensatory damages for legal fees incurred and that will continue to accrue.

106. Plaintiff demands trial by jury.

Dated: July 23, 2025                                    /s/ *Tamara Harris*

### VERIFICATION

Tamara Harris, an attorney duly admitted to practice law in the Courts of the State of New York affirms that she is the attorney for the plaintiff and is fully familiar with the facts of this matter. Affiant believes the content of the complaint to be true to the best of her knowledge and is not being filed for an improper purpose; and the grounds for this belief are based on conversation with plaintiff and a review of the case file. This verification is made by the undersigned as Plaintiff is not located in the county where the undersigned maintains her office.

July 23, 2025                                           /s/ *Tamara Harris*